It is going to be in re Custody of K.N.L., number 519-0082. Counsel, you may come on up to the tables. I'll mention that Judge Chapman is also on the panel in this case. She's unable to be here today, but she will be fully participating. She has the record and the briefs, and she'll be listening to the oral argument today. So I'll give her a reminder to please speak into the microphone since this is being recorded and Judge Chapman will be listening. May it please the Court, Counsel. Your Honor, would you introduce your name for the record? Your Honor, my name is Alan Ferris, and I represent the appellants in this case, Rebecca and Gary Ferrari. Rebecca is the paternal grandmother of K.N.L., who is the subject of this proceeding, and the appellee is Bethany Moore, the child's mother. The child's father, Christopher Leiter, is deceased. Immediately after the birth of the minor, the state filed a petition for adjudication of wardship, alleging that the baby was born drug-exposed by virtue of Ms. Moore's admission to the use of marijuana, opiates, and heroin during her pregnancy. The court entered an adjudicatory order granting legal custody and guardianship to the Department of Children and Family Services, to which the mother consented after stipulating the facts in the petition. The Ferraris, as foster parents, had the child in their care under the auspices of the Department for the next two and a half years. In the meantime, Ms. Moore and Mr. Leiter were charged by the Randolph County State's attorney with residential burglary. Mr. Leiter died by incarceration at the county jail. Ms. Moore entered a plea of guilty, was sentenced to four years in the Department of Corrections, conditioned upon her successful completion of the impact incarceration program. She was released in about six months. In April of 2018, the Ferraris filed their petition for allocation of parental responsibilities under 750 ILCS 5-601.2b3, alleging that the minor was not in the physical custody of a parent. The trial court granted Ms. Moore a motion to dismiss filed under 2619, finding that the non-parents did not have standing to pursue their petition. Your Honors, the sole issue before this court today is whether or not the mother voluntarily and indefinitely relinquished physical custody of her daughter by stipulating to the neglect charges, which thereby placed custody and guardianship with the Department of Children and Family Services. Counsel? Yes. And I know the situation comes up frequently in the juvenile court, and the arguments read in the briefs, you know, if the court was to reverse in this case, would that not open up the floodgates? Excuse me, Your Honor. That was the concern of the trial court. And we submit that had their legislator wanted to put an exception to the strict jurisdictional statement that at the time of the filing, the child was not in the physical custody of a minor, they certainly could have done that. And that is not done. Secondly, we're not seeking here to do anything but share or have an allocation of the parenting responsibilities. It's not a situation where we're an upheaval of what is going on in the juvenile case. It's just that there is a party who's had the child for two and a half years, is related, the father is deceased, and they're seeking in the best interest an allocation of parental or grandparental time with that child. So I don't know. In addition, I think the issue with the Juvenile Court Act, there's some consistency here, because under the Juvenile Court Act, the provisions also allow foster parents to intervene, give foster parents standing, and they can seek continued and additional placement in the certain cases. Furthermore, under the foster parent law, there again is standing to participate with notice and the right to intervene. So I don't think that it's necessarily contradictory that we have to do one or the other. And in this case as well, the October 2018 order of the court gave Ms. Moore legal custody of the child, subject to the filings and the pleadings in the family court case. So I'm not sure that they're mutually exclusive. I think the court can move forward with the permanency goals, but still respect the rights of the, in this case, the paternal grandparent and the best interest. Almost virtually the entire life of this child was with my clients. So I think best interest here certainly should dictate what happens. Counsel, I'm kind of curious, I don't know that it's relevant or not, but the timing of the petition and then the order in, I guess, the juvenile case. Can you comment on that? Is there relevance or not? Well, I know in the appellee's brief, they made the case or tried to make a case that, yes, it was filed. At the time, the department still had custody and guardianship in April, April 6th, I think it was, but Ms. Moore didn't get served until April 9th after she got returned to the physical possession of the child. But the statute, again, says on the date of filing, that is what the determination is to be made upon. There's case law in my brief that says everything after that date of filing is irrelevant to the issue of standing. That is the determinative time. And at that point, it can be undisputed that the department had legal custody, the department had guardianship, and there was visitation that was occurring after Ms. Moore was released from prison and impact. But at the time of filing, the question is, was the child in the physical custody of the mother? And we submit she wasn't. We also think, judges, that we have to look at the term voluntary relinquishment. Voluntary relinquishment was stated, the definition, in the Tatiana case, which Applebee's cites in its brief. And that is defined as an affirmative act of waiving or abandoning a known right. Well, we submit that Ms. Moore voluntarily came into court and stipulated to the facts of the neglect petition and abandoned her right to have parental custody over the child. In addition, as the court knows, the issues of what physical custody is have been defined throughout the cases. And it turns on three factors. One is who's responsible for the care and welfare of the child on a daily basis at the time of the filing of the petition. And it wasn't Ms. Moore. Ms. Moore, it was my client and the department of the auspices of the department. Secondly, how the manner in which the physical possession was acquired by the non-parent. Here we have a court order. We don't have a situation where parents go on vacation and a grandparent or some other non-parent has the child and they rush to the courthouse. Claim that we have the child so we want custody. It's not our case. Furthermore, the nature and duration of the physical possession. At the time of the entry of the adjudication order and surrender by Ms. Moore, there was no time frame that she was going to get that child back, if ever. In fact, you read the notices provided to her. It says you comply with the permanency goal and do everything you're supposed to do or you face termination of parental rights. So we maintain that that's an indefinite relinquishment of physical custody. I think the court would be helpful if the court would consider by an analogous situation when a parent pleads guilty or goes to prison and obviously cannot care for the child. In each situation, in a case here as well as that situation, and the AWJ case, which is relied heavily on in my brief, is that case as far as incarceration. State files allegations of a statutory offense, both cases. A parent comes into court, voluntary stipulates to the fact and the charges, both cases. State requests for a remedy or disposition is granted, both cases. And there's a loss of rights. In incarceration, obviously, there's a loss of freedom. In this case, you lost the ability to parent your child to some time in the future. The cases, AWJ and other cases, go on to state that incarceration meets the voluntary relinquishment standard. Now, in this case, it's an additional twist because several months after the initiation of the juvenile case, Ms. Markley is guilty of residential burglary and sentenced to four years in the DOC. That as well should be considered a relinquishment of physical custody. And in most cases, once you're out on parole and what happened, released from the DOC, you're able to get your child back. Here, she's precluded because of the prior juvenile case. So we submit that that's even more strength as to why the court should determine that she did not have physical custody of that child, and my clients, who cared for the child virtually all of her life, should be granted standing to move forward and ask for allocation of parental responsibilities. There are a couple cases I'd just like to touch on and distinguish. These are all fact-specific cases, obviously. In the court's de novo review that the court must make without deference to the trial court, we look at the facts. Cited in the Appellee's brief is the Tatiana case. That's a guardianship case which the mother would never sign over guardianship rights and actually had the child for a year before a grandparent filed for guardianship. The court said no relinquishment there. That's not our case. Further, the Supreme Court case in Peterson, that's a case where divorced and mom goes to live with her mother with a child and father is a good father, visits, does everything he does in his parenting plan, and mother becomes ill. Grandmother takes care of both the child and the mother until mom dies. At the funeral, dad comes over and asks for the child to be returned to his care. Grandmother refuses. Supreme Court says no relinquishment. Dad gets the child. That's not our case. Those aren't our cases. The cases cited by Appellee are easily distinguishable. So we believe that when the court takes a look at the facts of this case, when the court takes a look at the statutes, and another point here I want to bring up is that statute says that at the time of filing, the child is not in the physical custody of a parent. It doesn't say the petitioners are in physical custody of the child. It says that the parent is not in physical custody. That W.J. case, again, the reference, we had one of the paternal grandparents had guardianship while son went to prison. The court found that the maternal grandparent had standing to pursue, even though she did not have the child in her care at that time. So with that, Your Honors, we submit that the decision of the trial court should be reversed on the issue of standing and that this case should move on to a determination of what's in the best interest of this little girl and a determination of what is a fair and just allocation of parental responsibilities. Thank you. May it please the court, counsel? Your Honor, before I forget, before I run out of time, I would like to start actually by addressing some of the points that you brought up already and some of the points that he made. He mentioned that the legislature could have included some specific kind of language or provision in the statute, essentially addressing cases like this. That was his rebuttal to the idea that it might open the floodgates, as he said. The legislature doesn't define one way or the other in any specific way in the statute what counts as a voluntary relinquishment of custody, and I don't think that it ever intended to. I think it meant to leave that open for interpretation of the courts, and various courts have interpreted it in various ways. So I don't think the idea that the legislature decided on that is really all that relevant. It's also, you mentioned the timing. I believe it was April 6th and then April 9th, I believe. April 6th, the petitioners or the appellants filed their petition for allocation of parental responsibilities, and then three days later a permanency order was entered in the juvenile case, essentially returning possession of the child to Bethany, the mother. It's my understanding that the state essentially reacted. They learned that the grandparents were filing, and then quickly, right away, it wasn't just a coincidence that three days later, they quickly then filed the permanency order. I think that's telling because, and it is relevant to this case, because it clearly showed that DCFS fully intended for Bethany to regain full custody of the child. Was the goal, I guess, was the goal always return home? Yes. In 12 months. Yes. And that is actually explicitly stated on one of the orders. I think it's the adjudication order, maybe, in the juvenile case. It's in the record. And it says on it, explicitly written in there, a return home hold date of 12 months, within 12 months. Counsel, do you think it would have made a difference if, I understand your client was incarcerated for a period of time, and then she was out at the time, you know, the petition was filed. If she had been incarcerated and, let's say, the grandparents had filed a petition while she was incarcerated, do you think that would have made a difference on standing? I actually do. I was wondering what was going to be up next is, that may, that would be a different case, I think. But he, I mean, you know, Mr. Ferris admits in his brief that he, and the case law is clear that the relevant time frame to look at here is when relief is sought, meaning when the appellants in this case filed their petition for allocation, when they sought custody. That's the time period that you have to look at. And the bottom line is, at that time, she was not incarcerated. Bethany was not incarcerated. So, and by the way, in the brief, he cites several cases, and he just discussed several cases in which they talk about parents who are incarcerated. And those cases do state that whenever a parent is incarcerated, that's kind of the equivalent of them voluntarily relinquishing custody. All of those, in all of those cases, the parent in the case is incarcerated at the time the other party sought relief, at the time they petitioned for allocation, or petitioned for custody was filed. That's clearly distinguishable from this case, and in a very important way. She was out of the IAOC for quite a while in this case, and was visiting the child regularly. So as far as I'm concerned, the cases cited in Mr. Ferris' brief about incarceration are almost irrelevant in this case, because it's just she wasn't incarcerated at the time. I also would like to make the point that, you know, the standing requirement that is at issue in this case is ultimately based on and there because of the superior rights doctrine, which, of course, states that, you know, there's a presumption that a natural parent's right to physical custody of his child is superior to a non-parent. And it's in the child's best interest to be raised by their parents. I think that should not be overloaded or given short shrift in this case. I think the Illinois Supreme Court said it best. They called it a fundamental liberty interest, and they said, quote, that fundamental liberty interest, quote, does not evaporate simply because a parent has not been a model parent or has lost temporary custody of the child to the state. I think that's a very relevant and important statement in this case, because that's what happened here. So, of course, the key legal standard, as Mr. Perez explained, the key legal standard, the key wording to focus on here is whether or not Bethany, at the time the Ferraris sought custody, had, quote, voluntarily and indefinitely relinquished physical custody. And I think both of those words are key, voluntarily and indefinitely. It says and. It has to be both. And so, you know, I think it's clear that the appellants in this case want the court to focus almost entirely, almost exclusively on one factor, which is that at the time they sought custody, they had been in physical possession of the child for about 18 months and were doing most of the day-to-day caretaking. All the case law is very clear that's only one of several factors to be considered and that the issue of physical custody as a legal term of art does not turn solely on physical possession. So there are other factors to consider, a couple of which Mr. Perez mentioned. So, for instance, the manner in which physical possession of the child was acquired by the Ferraris in this case, that's one factor to consider. In analyzing that, I would ask the court to sort of turn back on the central language of the legal standard by asking the following question. Did the Ferrari acquire physical possession as a result of Bethany's voluntary and indefinite relinquishment of custody? And the answer is no. Let's look at voluntary and indefinitely separately. So did she voluntarily relinquish custody at any time? Bethany found herself in a situation that a lot of parents find themselves in, in Illinois, which is a common situation, and that is she was facing allegations from DCFS about her, at the time, ability to be a good parent. She had to appear in a court of law in front of a judge and people from DCFS and the state. It's a very intimidating environment. The trial court specifically knows that it's a very intimidating environment, that often the death seems stacked against someone in that situation. So I ask the court, in that type of a situation, can we really, in any real meaningful way, can we say that she voluntarily relinquished custody of the child? I mean, this isn't a technical question. It's in any meaningful way, did she really choose to or want to relinquish custody of the child? I propose the answer is no. She sort of was up against, you know, she had her back against the wall legally. She acted on advice of counsel and stipulated to the allegations against her, which resulted in her temporarily losing custody, but that, you know, wasn't voluntary in the real sense, which the trial court helped in this case. As for Bethany, I think that question is even clearer. So this is important. At every point in this case from day one, when the Ferraris first were granted physical possession of the child, from that point on, all parties involved, DCFS, the Ferraris, and Bethany, all had the same understanding, which was that Bethany was going to regain custody at some point in the future. They stated a goal date of 12 months, and that the Ferraris' possession would be temporary. All parties understood that from day one. And so I'm not sure how the petitioners are even really arguing that she ever indefinitely relinquished custody. She simply didn't do that. It was always temporary. Her relinquishment, you know, whatever there was, was always temporary in nature. And I would also ask the court to kind of, I guess, what I would call take a look at the big picture here. And what I mean by that is actions often speak louder than words. So when you're asking yourself the question of did Bethany ever, again, voluntarily relinquish custody, look at her actions. So ever since back in 2016 when she was released from IDOC, from the Department of Corrections, look at the actions that she took. While she was in IDOC, she completed the Impact Incarceration Program and was released early, after only five months. Since that date, she has avoided all criminal activity. She stayed sober. She's generally turned her life around. And she has, most importantly, exercised weekly visitation, not monthly, but weekly visitation with the child, really for almost the entirety of the time that the child was with the Ferraris. So look at those actions as a whole and ask yourself, if she had voluntarily indefinitely relinquished custody and sort of given up on ever getting custody of her child back, would she have taken those significant actions to improve her life? I think the answer is probably not. And I'd also like to, I think there's a real policy concern to address here, and it was addressed by the trial court. And that is, in cases like this one, which, again, is common, where parents face accusations from DCFS regarding their fitness as a parent, a particular process or course of events often takes place, and that is as follows. A parent is advised by their attorney often that the best course of action for them is to stipulate to the allegations, because they'd be difficult to overcome in court, and in return for their stipulation or cooperation with the department or with the state, the department would essentially make certain recommendations of a course of action for the parent, whether it be counseling programs or rehab or something, and they would make those recommendations, and then as long as the parent is sort of stuck with the plan and follows those recommendations or requirements, they would get custody of their child back as soon as possible, often within 12 months. That's a very common process to occur in these cases. Imagine if it was held in this case that the Ferraris had standing to request custody. I mean, I think that truly would open the floodgates for any temporary third-party custodian like the Ferraris, who was appointed by DCFS as a temporary custodian of sorts. They would then all have standing to request a permanent kind of custody or, you know, to request allocation of parental responsibilities. And not to mention, you know, there's a reason that the process I just described exists. It saves the court time and resources by not having to have full-blown adjudicatory hearings in every case. It helps, you know, parents have a reason to stipulate because it's in their best interest. If, I mean, if Bethany is held to have relinquished her parental rights, essentially, and, you know, relinquished physical custody of the child by way of stipulating to the allegations, again, no attorney is ever going to advise their client going forward in any case to stipulate to allegations against them. And everybody's going to request an adjudicatory hearing, and it's going to eat up a lot of time and resources of the court and the state and the department. Because who, you know, going forward, who in their right mind would stipulate to any allegations from DCFS if it means, you know, they could lose their rights? That's a real policy concern. That's part of why the trial court ruled the way that it did. Lastly, I would say that one other factor, quickly, that the case law does say that the court should consider is the nature and duration of the possession, meaning in this case the Ferrari's possession.  It was not, in my brief, the way I described it, it was not absolute or exclusive. It wasn't absolute, meaning that DCFS still had legal custody. DCFS was still in charge of making all major life and health-related decisions for the child. They made, DCFS made monthly visits to Ferrari's home to check up on things. It's not like the Ferrari's were, you know, had absolute or total control of the child. Well, they cared for the child for two and a half years. And I think the counsel mentioned the case where it doesn't have to be, you know, the same grandparents, for example, I think the case he referenced, to seek custody and have standing in that particular case that he cited. So the fact that they didn't have the ultimate legal authority, that's not really dispositive, is it? It may not be dispositive. I just think it's relevant to consider. But I take your point. As I said, so it also wasn't exclusive. And I think this is actually very important. Their possession of the minor child, the Ferrari's possession of the minor child, was also not exclusive in that Bethany, again, exercised a weekly visitation. And the record reflects, by the way, that she very rarely missed a visitation. I mean, it was every week. It wasn't just monthly. And I think it was Rebecca Ferrari admitted on the record that the only time she would miss is if the child or her were pretty sick. So she, you know, she maintained a relationship with the child. She saw the child on a regular basis, again, really for the entire time that the Ferrari's had possession of the child. I think that's important. And I think the case law, like my brief, makes it clear that that should be given quite a bit of weight again. In the Tatiana case that you mentioned, yes, the facts are not exactly like the facts in this case. I will admit that. But it is relevant that the child had resided with the grandparents for seven years in that case, for seven years, as opposed to about 18 months in this case. And the court held that the mother had not relinquished custody in large part because the mother had regularly visited the child for birthdays and holidays during that time, the seven years. So, yeah. All right. For those reasons. Yes. For relief. Thank you. Thank you, counsel. Thank you. Just a few comments with respect to Mr. Grohman's argument. Again, the focus has to be on mothers not having physical custody. As far as my client having possession, but the DCFS was really the one, that's not what we should be concerned about. Because the legal custody and the guardianship went to the department. But the day-to-day supervision of this child was my client's. But in either case, mom didn't have the care for this child for two and a half years. How do you get past the fact, or is it relevant at all, the fact that in the juvenile case, it had this permanency order. Up to the final one, it was the goal was to return home within 12 months. And how does that square with a requirement that there be an indefinite deletion? Well, first of all, that's a goal. And every permanency order I think I've ever seen in a juvenile case has a 12-month goal to return the child to the parent. In this case, that goal, it was three years. That goal was not met. It was three years before that case was closed and the child came back and legal custody was vested in mother. So to say 12 months doesn't mean 12 months. It's somewhere out there based upon the compliance with DCFS requirements and the fulfillment of the permanency goals. At that point in time, it might be 12 months. It might be 24 months. It might be never. But at that point, that's the goal. But it all depends upon the compliance by the mother. So it's out there, but no one can say what the definite date is under the juvenile case. So, again, that 12 months is nice to say as a goal, but there's no specific time that that mother can expect the child to come back to her as a legal custodial parent because it all depends upon what happens for the next, in this case, three years. In addition, I think we have to draw the parallel, again, between a person coming into court being told, you better plead guilty because they could find you convicted of a much stiffer offense, take a plea agreement and move down the road and maybe cut your time, make the best deal you can get. That's recommended, and vis-a-vis what we have here. Come in here. Someday you can work and straighten up your act. You can get your child back. Okay. Well, what's the difference between pleading guilty and a plea agreement to that situation? In both cases, and the cases are clear on this, in both cases, the parent is precluded from providing care and welfare for the child and from participating in the child's everyday life. In incarceration, that happens, and that's been found to meet the standing requirement, and I submit in this case it is virtually identical. In addition, I don't think of floodgates. I think that's sort of a make-weight argument here that I don't find is totally real. We have some specific cases or specific facts here. We've got a grandparent. We've got a deceased son. We've got the immediate birth of this, immediately after the birth of this child, grandma steps in with her husband, cares every day for this child. She becomes the foster parent under the DCFS case. I mean, I don't think you're going to find that in every case that comes down the road. And in this as well, Ms. Ferrari provided the food and clothing, provided the transportation to Cardinal Glen Hospital, got the prescriptions for the child. She forbade a potential career as a physician's assistant because of her duties to that grandchild. So, again, I don't think that this is a case where we make this ruling and give this lady standing or give these people standing to share. We're not asking for termination of rights or anything like that. We're asking to share in the parental responsibilities under the Family Law Act as it set forth in 2018. Finally, if I can, Mr. Groman cited the court about his concern and that floodgate argument. In the last couple pages of the court's ruling, the trial court stated, so I don't believe it was voluntary. So I believe a 619 motion is appropriate. Yet that doesn't mean that I don't think that the minor should have a lot of contact with the grandparents. That's not what I'm saying. I just don't believe that placement by a court constitutes voluntary and indefinite relinquishment of parental rights. We're not talking about parental rights in this case. We're talking about sharing of parental time and decision-making authority. Then he finally says, I appreciate the indulgence here. Maybe I'm wrong. I don't know. So we submit with that, with all due respect, that case should be reversed and sent back a remand. Thank you. Thank you, counsel, for your arguments. The court will take this matter under advisement, render a decision in due course.